|,BYRNES, Chief Judge.
Plaintiff-appellant, Clarence Gartoucies, appeals a judgment dismissing his claim against the defendant-appellee, Plaque-mines Parish Government. We affirm.
This is a fact intensive case dependent entirely on the findings and credibility calls of the fact finder (the judge in this case), i.e., the manifest error standard of review is dispositive.
On May 15, 1995, the plaintiff-appellant, Clarence Gartoucies, filed suit against the Plaquemines Parish Government (hereinafter “PPG”) for damages relating to an alleged injury that occurred on March 16, 1993. Plaintiff further alleged that the injury was attributable to the fault of the PPG and the unseaworthiness of a vessel owned by the PPG while plaintiff was in the course and scope of his employment with the PPG.
A judge trial was held on March 17, 1999. The parties stipulated to the introduction of the depositions of seven physicians and two economists.
The plaintiff testified that he was born on March 26, 1926, and worked aboard the Authority II, which is a boat owned and *347 operated by the Plaquemines | ¡¿Parish Government at the time of the alleged accident. He worked seven days on and seven days off on the 6:00 p.m. to 6:00 a.m. shift. He testified that he weighed 250-260 pounds at the time of the alleged accident and that prior to that time he had not been to a hospital since World War II, other than to see Dr. Meaux for chiropractic adjustments to his back. The plaintiff stated that he had not had any previous back or shoulder problems while working on the Authority II.
According to the plaintiff, on the morning of March 16, 1993, the Authority II was tied to the dock at the Coast Guard Station in Venice. He claimed that the captain of the boat, Lloyd Duncan was sleeping. It was rainy and windy that morning and the tide was running high. Because the tide was high, the boat was riding 3/é to 4 feet above the dock. The plaintiff claimed that he was expected to exit the boat by stepping into tires tied to the outer hull and jumping to the dock below, which he attempted to do at around 5:30 a.m. In doing so, he lost his grip on the boat and his foot slipped causing him to fall to the dock on his right side. Plaintiff, claims that he laid on the ground for some time and called for help several times. Eventually, he managed to get up and get into his truck and drive home.
The plaintiff claimed that his arms, back, neck and legs hurt all day, so he decided he could not go to work the next day. He did not seek medical attention because his injuries prevented him from getting out of bed and he did not have a phone with which to summon medical assistance. Around 3:30 to 4:00 p.m. that day, the plaintiff managed to get into his truck and drive to Captain Duncan’s home to tell him that he would not be able to go to work. Finding himself unable |ato get out of his truck because of his injuries, he blew his horn until Captain Duncan came outside to his truck, whereupon plaintiff informed him of his injuries. Captain Duncan testified that the plaintiff did not report any injury to him at any time that day. The plaintiff contends that he was unable to go to a doctor until three days after the accident because he had to wait until after the weekend to get an appointment. However, when he did go, the doctor’s records contain no reference to any accident. The plaintiff went on to testify that he had not seen any doctors for any other problems prior to the fall.
Plaintiffs story fell apart on cross-examination. He admitted that he weighed over 300 pounds at the time of the alleged fall and that he had been seeing Dr. Knox for arthritis since 1991. Dr. Knox’s records reflect that in May of 1991, he gave the plaintiff a shot of cortisone for arthritis and quinine for leg cramps. On March 19, 1993, plaintiff returned to Dr. Knox complaining of back pain that he attributed to his prostate or kidneys. Dr. Knox felt that plaintiffs back pain was consistent with prostatitis. At the time the plaintiff mentioned no work-related accident. Dr. Knox noted no abrasions, broken bones, or any other evidence of trauma. Dr. Knox noted no back spasm at the time.
Plaintiff returned to Dr. Knox on April 7, 1993, complaining of a back pain of a different nature — more musculosketal by history than the pain reported on the earlier examination which was more consistent with prostatitis. In April, the plaintiff again reported no traumatic injury. X-rays revealed severe degenerative problems with plaintiffs vertebrae such as occur as a result of wear and tear over | ¿time. Dr. Knox opined that plaintiffs obesity had accelerated the degenerative process. The X-rays showed no sign of traumatic injury and Dr. Knox observed nothing else indicative of a fall. Dr. Knox *348 prescribed MRT treatments which deliver magnetic impulses to the spine to alleviate pain.
On April 20, 1993, he returned to Dr. Knox’s office seeking renewal of prescriptions for back pain. He returned again on May 6, complaining of coughing and right shoulder pain. Dr. Day noted that plaintiff reported that his back pain had improved. Dr. Day injected plaintiffs shoulder with Depo Medrol and Carboeaine based on a diagnosis of bursitis!
When plaintiff returned on August 2, he complained of back and shoulder pain and expressed a desire to “stay off work.” Dr. Knox testified that plaintiff was tender from the sixth thoracic vertebra through the twelfth and the third lumbar through the first sacral. He also had swelling in the extremities. He complained of insomnia and “restless legs.” Dr. Knox noted an enlarged liver, typically caused by infiltration of the liver in an obese person such as the plaintiff, but Dr. Knox was not able to rule out the possibility of other causes.
Dr. Knox noted crepitations in plaintiffs neck for the first time during the August 2nd visit. Dr. Knox could not rule out the possibility of their prior existence, but plaintiff had not had any previous neck complaints. Plaintiff still reported no fall or other accident. Dr. Knox related the disc disease he observed to plaintiffs age and obesity and not to any accident or fall. An MRI of the plaintiffs dorsal spine was unremarkable. The MRI showed no evidence of any 1 ¿ruptured discs or pressure on the nerve roots or in the spinal cord, but it did confirm the degenerative changes previously noted by Dr. Knox. However, serious tendonitis and arthritic changes were revealed by the MRI in plaintiffs shoulder. Dr. Knox opined that the tendonitis was of several years duration. Dr. Knox added that on the question of the tendonitis, its cause and duration, he would defer to an orthopedist.
Plaintiff visited Dr. Knox again on August 16, complaining of back and shoulder pain. Dr. Knox noted that plaintiff needed Medrol Dosepak and he also needed to see orthopedic doctors. Plaintiff told Dr. Knox that he was reluctant to do strenuous work or twelve hour shifts. Dr. Knox told him to lose weight and prescribed the antidepressant, Prozac.
On August 23, Dr. Knox noted improvements in plaintiffs symptoms. Plaintiff told Dr. Knox that he wanted to be his own boss and that he didn’t want to do twelve hour shifts.
On August 30, Dr. Knox noted that plaintiffs weight continued its trend upward, reaching 323 at that time. Plaintiffs neck was feeling better at that time, but he still complained of his back and legs. Plaintiff told Dr. Knox that he was ready to return to work as a supervisor, but that he was emphatic that he couldn’t do manual labor or repetitive tasks involving. lifting.
Dr. Knox referred the plaintiff to Dr. Cashio who saw plaintiff on August 19 and September 2, 1993. He found “both history and physical findings suggestive of tendonitis of the rotator cuff’. He said that this condition is caused by certain | «types of motion and everyday wear and tear. But he added that it can be caused by trauma. Dr. Cashio testified that:
A. Well, he had a history of falling back in March and I didn’t see him until August, so he was having some symptoms at that time. It’s hard to relate the exact length of symptoms. He did say that his symptoms began after the fall, but not having seen him for several months after the fall, it’s hard to relate them.
*349 Q. So you don’t necessarily relate them to the fall.
A. Historically they’re related, according to him, and I don’t have any other source of evaluating it since I didn’t see him at the time.
[Emphasis added.]
Dr. Cashio testified that had he detected any muscle spasm he would have noted it. Dr. Cashio found no objective findings to corroborate the plaintiffs complaint of pain in the lower back with radiation down the legs. On cross-examination Dr. Cashio was asked to express an opinion in response to the following hypothetical question:
Q.... I ask you to assume that [the plaintiff] fell three feet, landed on his back, that he had no prior symptoms referable to his back or his lower extremities, and subsequent to that fall he had symptomology referable to his back consisting of day-by-day back pain and radiating pain into his lower extremities. Based upon that history, would you believe that the symptoms, from a reasonable medical probability, are related to the accident?
R. I think I answered that pretty well as I can in my previous answer. I’ll try to clarify it a little bit. I think the [accident] may have flared those arthritic conditions up for several weeks, but I think after a several week period the exacerbation from that fall should be expected to subside.
|7When asked what his opinion was concerning the prognosis for plaintiffs shoulder, Dr. Cashio opined that:
I think he basically had a rotator cuff tendenitis [sic] without a tear. The natural history for theses is occasional flare-ups with certain types of activities, but usually they can be managed' conservatively or at least nonoperatively.
It was also Dr. Cashio’s opinion that the arthritic changes in plaintiffs shoulder, more likely than not, ante-dated the alleged fall in March. He noted that the degenerative changes in plaintiffs lower back could be aggravated by obesity. He opined that the pain radiating down the legs coupled with the negative MRI indicated that obesity was the likely cause of his leg pain because of the effect of his weight on his back. Dr. Cashio concluded his testimony by stating that:
I think that his back pain is related to the arthritic changes in his spine that were aggravated by his overweight condition and doing a lot of heavy work for years, carrying around that extra weight, and that arthritic condition was flared up by the fall. Yes, that’s my testimony.
The PPG offered the deposition testimony of Dr. Gordon Nutik, an expert in orthopedic surgery who saw the plaintiff on April 10, 1996, • slightly more than three years after the accident. He also exám-ined some of plaintiffs medical records, MRI’s and X-rays. Based on the foregoing, Dr. Nutik issued a report on April 13, 1996, noting that plaintiff complained of neck pain, pain in both shoulders with most of his pain being in his lower back and referred pains in his legs. The plaintiff informed Dr. Nutik at the time that his “ankle is hurt real bad” but that it is unrelated to any accident. Dr. Nutik testified that he could not relate plaintiffs neck and shoulder complaints to the alleged fall from the boat.
|sDr. Meaux, plaintiffs chiropractor, admitted in his deposition that obesity could cause backaches and numbness and tingling in the extremities.
*350 Dr. Kenneth Adatto, an orthopedic surgeon who treated the plaintiff commencing in September of 1995, could not relate plaintiffs symptoms to the alleged fall.
We cannot say that the trial judge was manifestly erroneous or clearly wrong in concluding, as he obviously did, that the plaintiff failed to prove that he was in good health before the date of the alleged accident, that the plaintiff failed to prove that his problems arose immediately after the accident and not some time prior thereto or some time thereafter, and that the plaintiff failed to prove a causal connection between the accident and the alleged injury. As long as the trial judge could not be deemed to be manifestly erroneous or clearly wrong in reaching any of these three conclusion, plaintiff is not entitled to the benefit of the presumption of causation set forth in Housley v. Cerise, 579 So .2d 973 (La.1991).[1] Absent any of these three elements, the burden does not shift to the defendant to show that some other “particular incident” caused the injuries in question. Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615 (La.2/20/95), 650 So.2d 757.
As pointed out earlier in this opinion in connection with Dr. Cashio’s testimony, to the extent that plaintiffs doctors relate his complaints to his alleged |flfall they do so based only on self-serving information furnished them by the plaintiff. The record is replete with defects in plaintiffs testimony and other evidence, undermining his case and credibility, thereby justifying the refusal of the trial court to credit his testimony.
Plaintiff had been taking pain medication for several years prior to the accident, belying his testimony denying preexisting problems. The trial court could have reasonably concluded that when he testified that he weighed approximately 50 pounds less at the time of the alleged accident than he actually did, he did so in order to understate the probability that his weight may have had more to do with his complaints than the alleged accident. The accident occurred on a Tuesday, so contrary to his testimony on direct, it was not the interposition of the weekend that prevented him from seeking medical attention for three days. Plaintiff changed his story to explain this discrepancy by stating that Dr. Knox just wouldn’t see him for three days. He also admitted that he was diagnosed with prostate problems and arthritis in 1991 and had taken pain medication as recently as Vh months prior to the alleged faU.
Plaintiffs testimony that Captain Duncan was asleep at the time of the fall was contradicted by the testimony of Captain Duncan who said that he was awake.
At his deposition, plaintiff testified that he fell at 5:30 a.m., and he lay on the ground for twenty or twenty-five minutes. At trial he testified that the faü occurred between 5:45 a.m. and 5:50 a.m. he lay on the ground for five or ten minutes, and caUed for help several times whüe he lay on the ground. When no one responded, I mhe got up, went to his truck and went directly home without telling Captain Duncan that he was injured, and without stopping for medical attention or waiting for the 6:00 a.m. work shift to arrive.
*351 Dr. Serio’s medical records indicate that plaintiff failed a physical in 1987 because of back problems. Plaintiff admitted that Dr. Knox’s medical record of his visit three days after the alleged fall makes no reference to the any accident, only kidney and prostate problems. Dr. Meaux’s record of plaintiffs visit two weeks after the alleged fall indicate that the pains began one week prior to the examination (a week after the alleged accident) rather than two weeks. Dr. Meaux’s records also indicate that the pain was related to a “condition”, making no mention of anything arising out of employment. Dr. Meaux’s records also indicate that the plaintiff had had the same or similar symptoms in the past and that the onset of the pain was gradual rather than acute. No scrapes or bruises such as one would expect from the fall described by the plaintiff were noted by Dr. Meaux. None of plaintiffs medical records relate plaintiffs complaints to a fall until some three or four weeks after the date of the alleged fall and after plaintiff had consulted an attorney. Plaintiff signed a leave of absence slip on March 30, 1993 which stated that his “injuries did not arise in the course of employment.”
Medical bills submitted by the plaintiff in connection with asthma, flu and gall bladder problems had no relationship to the alleged accident even if this Court were to accept the plaintiffs story at face value. Medical bills related to | nmedication for the plaintiffs eyes, for a cough, for inhalers, and potassium were likewise not related to the alleged fall.
When confronted with records clearing him for return to light duty work in May of 1993, his response was that the doctors must be lying.
Plaintiffs daughter admitted that the plaintiff had a telephone whereby he could have phoned for a physician after the alleged fall had he chosen to do so. On cross examination she was unable to say why she had written in Exhibit PPG # 9 that the pain was related to an “other condition,” that the pain began one week before the doctor’s visit (when she knew that the fall supposedly occurred two weeks before visiting Dr. Meaux), that it was “recurring pain,” that the pain came on gradually and why there was no mention of the alleged fall in Dr. Meaux’s report.
Howard Wilcox, custodian of the personnel files of the defendant, the Plaquemines Parish Government, testified that according to those records the defendant failed a physical in 1987 because of his back problems but was given a waiver by the Parish President enabling him to be employed by the Parish. The defendant was terminated by the Parish almost one year after the alleged fall because of his failure to return to work after being cleared to do so by Dr. Knox in May of 1993.
Mr. Petrovich, the Parish President, testified that he was forced to terminate the plaintiff in spite of their friendship' because of his failure to show up for work. 11?.Mr. Petrovich testified that he was unaware of this litigation at the time he terminated the plaintiff.
Throughout this opinion there are examples. of problems in plaintiffs case such that it would be impossible after considering the record as a whole for this court to conclude that the trial court was manifestly erroneous or clearly wrong in rejecting plaintiffs claim.
As we have found that the plaintiff failed to carry his burden of proving that he was injured as alleged, we do not reach plaintiffs allegations regarding unseaworthiness and all claims related to maintenance and cure.
*352 For the foregoing reasons, the judgment of the trial court is affirmed.

AFFIRMED.

. Quoting from Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977):
[a] claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.